Belknap,
May 31, 1939.  } No. 3080.

**BELMONT** *v.* **LEGER PARENT** *& a.*

*Harold E. Wescott*, for the plaintiff.

*Dyer & Doherty* (*Mr. Doherty* orally), for the defendants.

PAGE, J. There was evidence from which the following facts might be found. The premises in question are located on Concord street, within the village fire precinct of Belmont. At the time of the trial, the defendant Leger had been maintaining a junk-yard there for seventeen years, and he also made his home there. A pile of old tires, numbering about two thousand, was located some fifty feet from the house and eight or ten feet from the garage. In the barn were stored about twenty tons of baled paper. The pile of tires was within fifty or sixty feet of the barn mentioned. Distant about one hundred feet from the barn is a house which could be found to belong to a stranger to these proceedings. In the barn, besides the paper, were a few bags of rags and a little burlap. On the premises were some used cars, and Leger also dealt in automobile parts, which his testimony suggested was an important part of his business.

In the spring of 1938 the selectmen of Belmont requested Leger to remove his junk business from the premises. He refused. On or about June 26 the selectmen voted to require that all such business in the town be put under license in accordance with P. L., c. 159. On June 28 they notified Leger in writing that from and after July 1 he would have to hold such a license. They also stated that his junk-yard in the present location was a menace to the town's water supply.

At a conference between him and the selectmen on June 30, Leger asked informally for a license to do business at the place he now occupies, but the selectmen told him that they could not approve that place. It could be found that this informal denial of Leger's informal application rested upon the finding that the premises as used by him

involved a fire-hazard, as well as a menace to the water-supply. At this conference, the selectmen offered to get Leger a piece of land elsewhere and to move his property there with the trucks of the town, but no specific place was named. The offer could be found to have been in good faith, whether or not the selectmen had authority to make it, and has some bearing upon the question whether their attitude was reasonable, rather than arbitrary. The selectmen desired Leger to continue in business, but without the precinct, in a location similar to that where another dealer, later licensed by them, stores substantially all of his stock.

In answer to this proposal, Leger said that he would not move. Since July 1 he has done some business in the old location. Asked at the trial of the bill in equity whether he would be willing to move to some other location in the town that might be found to be suitable, he expressed a determination to stay where he is, and said that he would not agree to move his yard even to another place on the same street. Finally he said that if the selectmen would buy and deed to him a particular place on that street, he would consent. The selectmen are under no duty, in such circumstances as are disclosed, to point out a place acceptable to them, but only to pass upon a place suggested by him. He has never, even by indirection and informally, asked them for a license to do business anywhere except where he is now located. Moreover they are under no obligation, even if they have the authority, to buy another site and give it to him.

Under section 1, chapter 159, Public Laws, the selectmen (there being no police commission in Belmont) may in their discretion license any suitable person to carry on the junk-business and "may determine and designate the place where the business is to be carried on, and the place where the commodities aforesaid may be accumulated, stored or handled under such license." Section 5 gives the Superior Court authority to enjoin the conduct of the business without a license.

Therefore the only question before us is whether the defendant Leger may transact his business without a license. The statute itself answers that question, for section 4 makes his act in so doing expressly unlawful. The defendant Malvina may not permit the illegal use of her land. The suggestion that the vote to require the license was not recorded until July 25, 1938, does not require much consideration. As far as appears, the recording antedated the filing of the bill in equity. Moreover, Leger had seasonable written notice

of the vote and was told that he could have no license to do business where he wished to do it. Yet he persisted in the untenable claim that he had a legal right to go on without a license, long after the legal and equitable situation became fully known to him, and even after the vote had been recorded.

The defendants have not raised by appropriate mandamus proceedings the question of the propriety of the action of the selectmen in refusing to grant a license as informally requested by Leger. Since, however, the case was tried upon the mistaken theory that the question was in issue, it may be said that upon the evidence there would seem to be no merit in the contention of the defendants, even if the question were before us.

A decision upon an application for license will be reversed only upon a conclusive showing that the decision is not tenable. *State* v. *Cohen*, 73 N. H. 543, 547; *Silverman* v. *Gagnon*, 74 N. H. 502, 503; Bowers, Judicial Discretion, ss. 17, 18. It is not a compelled finding that the selectmen exercised their discretionary functions with impropriety. The design of the statute is to localize the junk-business, as well as to confine it to conduct by proper persons. *State* v. *Cohen, supra* 548; *Silverman* v. *Gagnon, supra,* 503. Whenever the record discloses tenable ground for finding the requested location contrary to public interest (as that the location involves a fire-hazard within the village district), no finding of arbitrary action in denying a license can be compulsory.

*Exception overruled.*

All concurred.