NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2013-357


PROLERIZED NEW ENGLAND COMPANY

v.

CITY OF MANCHESTER

Argued: March 5, 2014
Opinion Issued: August 28, 2014


Shaheen & Gordon, P.A., of Concord (Donald C. Crandlemire on the brief and orally), for the petitioner.


Office of the City Solicitor, of Manchester (Peter R. Chiesa on the brief and orally), for the respondent.


BASSETT, J. The respondent, the City of Manchester (City), appeals an order of the Superior Court (Brown, J.) denying the City's motion to dismiss and granting the motion for summary judgment filed by the petitioner, Prolerized New England Company (Prolerized). The City argues that the trial court erroneously ruled that RSA chapter 322 preempts the City's ordinances regulating junk and scrap metal dealers. RSA ch. 322 (2011 & Supp. 2013). We reverse and remand.

The trial court found the following facts to be undisputed. Prolerized is engaged in the business of scrap metal recycling, and operates two scrap metal recycling centers in Manchester. There is one other licensed scrap metal yard within the City.

In 1995, the City adopted an ordinance requiring scrap metal dealers to maintain for inspection certain records regarding every transaction as a condition to the license to operate within the City. Manchester, N.H., Code of Ordinances § 114.03(B) (1995). The ordinance required dealers to document the proven identity of the seller, the date of the transaction, and to maintain an accurate, detailed description of each item purchased. Id.

In 2012, in an effort to combat the growing problem of scrap metal theft, the City adopted § 114.03(C), which requires scrap metal dealers to prepare transaction records electronically "as directed by the Chief of Police or his designee," and to forward them "to the Police Department or authorized data storage site . . . no later than 24 hours after completion of the transaction." Manchester, Ordinances § 114.03(C) (2012). Subsection 114.03(C) also requires that the electronic transaction records include a digital photograph of the scrap metal seller and a color digital photograph of all items sold in the transaction. Id. The City also adopted § 114.03(D), which requires dealers to include a complete and accurate description of the seller's vehicle, as well as § 114.03(E), which levies a fee of fifty cents per electronic transaction for which a record must be prepared pursuant to § 114.03. Manchester, Ordinances § 114.03(D), (E) (2012).

Pursuant to § 114.03(C), the City designated a private company, LeadsOnline, as the authorized storage site for the electronic transaction records, and directed Prolerized to set up a user account and begin uploading data. Shortly thereafter, Prolerized filed a petition seeking declaratory and injunctive relief, arguing that § 114.03, as amended, is preempted by State law. Prolerized also argued that the fifty cent per transaction fee is an unlawful business tax because it raises revenues in excess of the reasonable costs to the City, and violates Prolerized's constitutional right to freedom of contract and equal protection. The City filed a motion to dismiss, and Prolerized filed a motion for summary judgment. The trial court denied the City's motion to dismiss and entered summary judgment for Prolerized, ruling that State law preempted § 114.03. Because of its preemption ruling, the trial court did not consider whether § 114.03 imposes an unlawful business tax or violates constitutional protections. This appeal followed.

"We review de novo the trial court's application of the law to the facts in its summary judgment ruling." EnergyNorth Natural Gas v. City of Concord, 164 N.H. 14, 15 (2012) (quotation omitted). "We consider all of the evidence presented in the record, and all inferences properly drawn therefrom, in the

light most favorable to the non-moving party." Id. at 15-16. "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. at 16 (quotation omitted).

On appeal, the City argues that its ordinance "relative to transaction fees, digital record keeping, and digital reporting neither expressly contradicts the statute nor intrudes upon an area reserved to the exclusive control of the General Court." Prolerized counters that the trial court properly concluded that, because § 114.03 and RSA chapter 322 conflict, the state statutory scheme preempts the City's ordinance.

I. General Principles

"Preemption is essentially a matter of statutory interpretation and construction." EnergyNorth Natural Gas, 164 N.H. at 16 (quotation omitted). "Statutory interpretation is a question of law that we review de novo." Id. "We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." Id. "In interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Id. "Unless we find statutory language to be ambiguous, we will not examine legislative history." Clare v. Town of Hudson, 160 N.H. 378, 384-85 (2010) (quotation omitted). "Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation." EnergyNorth Natural Gas, 164 N.H. at 16.

"Preemption may be express or implied." N. Country Envtl. Servs. v. Town of Bethlehem, 150 N.H. 606, 611 (2004). Express preemption is not claimed here. One form of implied preemption exists "when there is an actual conflict between State and local regulation." Id. That is, "[a] conflict exists when a municipal ordinance or regulation permits that which a State statute prohibits or vice versa." Id. Even when a local ordinance does not expressly conflict with a State statute, it will be preempted when it frustrates the statute's purpose. Id.

A second form of "[i]mplied preemption may be found when the comprehensiveness and detail of the State statutory scheme evinces legislative intent to supersede local regulation." Id. "When the State has preempted the entire regulatory field, any local law on the subject is preempted, regardless of whether the terms of the local and State law conflict." Id. at 612. Nonetheless, "[t]he mere fact that a state law contains detailed and comprehensive regulations of a subject does not, of itself, establish the intent of the legislature to occupy the entire field to the exclusion of local legislation." Id. at 611 (quotation omitted). "To determine whether the legislature has intended to occupy the field, the court may look to the whole purpose and scope of the

3

legislative scheme and need not find such intent solely in the statutory language." Id. "The very nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest." Id. (quotation and brackets omitted).

> [T]he following questions are pertinent in determining whether the state has preempted the field: does the ordinance conflict with state law; is the state law, expressly or impliedly, to be exclusive; does the subject matter reflect a need for uniformity; is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation; and does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature.

Id. at 611-12 (quotation and brackets omitted).

II. Comprehensiveness of State Statutory Scheme

RSA chapter 322 delegates to local authorities the general regulation of junk and scrap metal dealers. The legislature granted authority to "[t]he governing body of any town, city, or unincorporated place" to license, "in [its] discretion," junk and scrap metal dealers within the municipality. RSA 322:1 (2011). Local boards are authorized to issue and revoke licenses and "establish rules, regulations and restrictions," each of which "shall be incorporated in the license." RSA 322:2 (2011). These boards may designate the location for junk and scrap metal dealers to conduct business and to store their wares, RSA 322:1, and may, by regulation, designate areas of the city where these operations are prohibited. RSA 322:6 (2011). A dealer must keep "records sufficient to the licensing authority" — that is, the same municipal body — "of the accumulation, storage, and handling of commodities as a junk or scrap metal dealer." RSA 322:6-a (2011). RSA chapter 322 does not give the State a role in governing the management or operations of junk and scrap metal dealers. Thus, "[t]he design of the statute is to localize the junk-business, as well as to confine it to conduct by proper persons." Belmont v. Parent, 90 N.H. 249, 252 (1939).

Prolerized argues that RSA 322:6-a, RSA 322:7 (2011), and RSA 322:11 (2011) evince a legislative intent to establish a uniform statewide system of regulating junk and scrap metal dealers. However, each of these provisions grants control to the local board. Although RSA 322:6-a requires that the transaction records include certain information, it also requires each licensee to "keep records sufficient to the licensing authority," i.e., the local board. RSA 322:7 authorizes any officer with jurisdiction to enter the licensed premises, which would include local law enforcement. See 63 C.J.S. Municipal Corporations § 632 (explaining powers of police officers), § 633 (generally the

4

powers conferred on police officer must be exercised within territorial limits of municipality) (2011). RSA 322:11 requires a local board to establish the license fee and dictates that the fee be paid into the treasury of the city or town where the license is in force. Thus, not only do these provisions fail to demonstrate a legislative intent to preempt municipal control, they demonstrate precisely the opposite: an intent to delegate control to local entities.

Prolerized cites JTR Colebrook v. Town of Colebrook, 149 N.H. 767 (2003), in support of its claim. In JTR Colebrook, we held that the State Indoor Smoking Act preempted a municipal ordinance that prohibited smoking in any restaurant for public health reasons with certain strictly limited exceptions. JTR Colebrook, 149 N.H. at 768-70 (explaining statute), 773. We explained:

> RSA 155:77 provides that: "Nothing in this subdivision shall be construed to permit smoking where smoking is prohibited by any other provision of law or rule relative to fire protection, safety and sanitation." We interpret this provision according to its plain meaning and hold that it permits additional municipal regulation of smoking only with respect to fire protection, safety and sanitation, not with respect to public health.

Id. at 771. Here, in contrast, RSA chapter 322 contains no such limited authorization.

Significantly, in JTR Colebrook, we concluded that, given the comprehensiveness of the State Indoor Smoking Act and the balancing of multiple interests, it was "highly improbable that the legislature . . . intended to leave the ultimate public health regulation of indoor restaurant smoking to the vagaries of local regulation." Id. In comparison, here, the legislature has specifically delegated the regulation of junk and scrap metal dealers to local authorities. RSA 322:1, :2; :6.

Therefore, we hold that RSA chapter 322 does not constitute a comprehensive and detailed State regulatory scheme of junk and scrap metal dealers that occupies the field.

A. Record-Keeping

Our conclusion that the State regulatory scheme does not occupy the field does not end our inquiry because municipal ordinances are nonetheless implicitly preempted if they conflict with state law. See, e.g., N. Country Envtl. Servs., 150 N.H. at 611. Prolerized argues that § 114.03(C) and (D) are preempted because they impose stricter record-keeping requirements than are authorized under RSA chapter 322. Specifically, it argues that: (1) the

5

amended ordinance imposes more detailed record-keeping requirements than do RSA 322:6-a and RSA 322:7; and (2) RSA chapter 322 does not impose an affirmative obligation to transmit records, but only requires dealers to keep records. Prolerized also challenges the terms and conditions imposed by the City's designee as contrary to the statute. Because, as Prolerized notes, extension of this argument raises issues "not directly germane to the issue on appeal (i.e. preemption)," we limit our review to Prolerized's argument that RSA chapter 322 does not authorize a local board to require a licensee to enter into a contract with a private third party. We address these arguments in turn.

First, Prolerized argues that RSA 322:6-a evinces a legislative intent to preempt ordinances such as § 114.03(C) and (D), which require more detailed record-keeping requirements. Specifically, Prolerized contends that "[h]ad the legislature intended to allow municipalities to impose strict[er] requirements on scrap metal dealers concerning recordkeeping and handling, it could have explicitly done so like it did in RSA 322:1, 322:2 and 322:6." (Quotation omitted.) We disagree.

"An ordinance which merely enlarges upon the provision of a statute by requiring more restrictions than the statute requires creates no conflict unless the statute limits the requirement for all cases to its own terms." Peak v. City of Tuscaloosa, 73 So. 3d 5, 19 (Ala. Crim. App. 2011) (quotation and emphasis omitted). "[I]t is no objection to a municipal ordinance not in contravention of a state law that it affords additional regulation complementary to the end state legislation would effect." Id. (quotation omitted).

RSA 322:6-a provides that "[e]ach person required to be licensed under this chapter shall keep records sufficient to the licensing authority of the accumulation, storage, and handling of commodities as a junk or scrap metal dealer." This provision requires a licensed dealer to maintain records that the licensing authority — that is, the local board — finds sufficient, thereby vesting discretion within the local board to determine what is sufficient. RSA 322:6-a also provides that the transaction records "shall be legibly written in the English language and provide account and description of the goods purchased, the date and time of their purchase, and the name and residence, verified by photo identification issued by a governmental agency, of the seller." Read in light of the statute's mandate that such records be "sufficient to the licensing authority," these statutory requirements cannot be read as maximum allowable requirements. See, e.g., In re Guardianship of Williams, 159 N.H. 318, 323 (2009) ("the legislature is not presumed to waste words or enact redundant provisions and . . . every word of a statute should be given effect" (quotation and brackets omitted)). Because the statute vests the local licensing authority with the power to determine what additional information the records must contain to be "sufficient," we disagree with Prolerized that the more detailed record-keeping requirements of the ordinance conflict with the statute.

6

Next, Prolerized argues that RSA chapter 322 does not authorize the City to impose upon dealers the affirmative obligation to transmit transaction records to a third-party designee, but rather, only enables the City to require junk and scrap metal dealers to keep records. We disagree. The statute's mandate that dealers "keep records sufficient to the licensing authority" vests discretion in the local board to determine how a junk and scrap metal dealer keeps records, including the discretion to require dealers to keep records electronically on a third-party website. See RSA 322:6-a.

Moreover, RSA 322:2 provides a local licensing authority general power to adopt rules and regulations governing licensees. RSA 322:2 states that "[t]he board which grants said license . . . may from time to time establish rules, regulations and restrictions relative to the business carried on as aforesaid." The plain language does not limit the type of ordinances that a local licensing authority can enact; consequently, under the authority of RSA 322:2, a local licensing authority may require a junk and scrap metal dealer to upload data to a third-party designee. Given that RSA 322:2 enables a local board to enact regulations governing record-keeping, it was unnecessary to repeat the identical authority in RSA 322:6-a. Cf. Lessee of Hannel v. Smith, 15 Ohio 134, 146 (1846) ("But it is at least reasonable to suppose, that the Legislature having once, in the same act, made this express provision, deemed it unnecessary to repeat the identical words in every clause of the statute where this list of forfeited lands was treated of.").

Prolerized argues that the ordinance requiring the upload of data to a third party conflicts with RSA 322:7 because LeadsOnline, the City's designee, is not an "officer[] having jurisdiction" to enter onto a dealer's premises. See RSA 322:7 ("Any officer, having jurisdiction may enter upon any premises used by a licensee for the purpose of his or her business, ascertain how the licensee conducts business and examine all commodities purchased, obtained, kept, or stored in or upon said premises, and all books and inventories relating thereto."). However, RSA 322:7 governs only entries upon the physical premises to conduct an inspection and examination of commodities stored on the premises. It does not govern the transmission or storage of electronic data for the purpose of recordkeeping under RSA 322:6-a. Given that LeadsOnline does not enter the physical premises of the dealers, the City's requirement that dealers store the data in a designated manner and transmit the data to a third-party designee does not conflict with RSA 322:7.

In sum, nothing in RSA chapter 322 expressly prohibits what the City requires in terms of more detailed record-keeping requirements, or the transmission of transaction data to a third-party designee. Manchester, Ordinances § 114.03. Nor does anything in RSA chapter 322 limit the reporting requirements of dealers or the method of reporting to its own terms. A dealer complying with the City's record-keeping requirements can still

comply with the less-specific requirements of RSA chapter 322, and both the statute and ordinances can operate concurrently.  See State ex rel. Whiteco v. Bowers, 965 S.W.2d 203, 209 (Mo. Ct. App. 1998) ("A municipal ordinance may expand upon the provisions of a state statute by requiring more than what is required in the statute.").

Prolerized cites Tosi v. County of Fresno, 74 Cal. Rptr. 3d 727 (Ct. App. 2008), in support of its argument that municipalities cannot enact stricter requirements than those set forth in RSA chapter 322.  In Tosi, the California Court of Appeals concluded that state law preempted municipal ordinances, see id. at 732, that required, among other restrictions, that junk and scrap metal dealers engage in more detailed record-keeping.  Id. at 733.  The court found that these ordinances were preempted because the commercial activities of scrap metal dealers "are matters of statewide concern that our Legislature has comprehensively addressed through various provisions of this state's Penal and Business and Professions Codes, leaving no room for further regulation at the local level."  Id. at 733 (quotation and brackets omitted).  The California law does not authorize municipalities to adopt rules and regulations, and outlines in great detail the information that dealers must report.  Cal. Bus. & Prof. Code §§ 21600-21610 (2007 & Supp. 2013).  In contrast, RSA chapter 322 allows municipalities to adopt rules and regulations, and requires dealers to keep records "sufficient to the licensing authority."  RSA 322:2; :6-a.  Thus, Tosi is inapposite.  Accordingly, we conclude that the trial court erred when it ruled that the City's record-keeping ordinances were preempted because they were incompatible with State law.

### B. Transaction Fee

Subsection 114.03(E) states:  "Every junk dealer and/or scrap yard that purchases an item in which a transaction record must be prepared pursuant to § 114.03 shall pay to the city a fee of [fifty cents] per transaction due in full the second Tuesday of every month, for the preceding month."  Manchester, Ordinances § 114.03(E).  RSA 322:11 states that "no person shall be required to pay a larger fee for said license than that required to be paid by any other person in the same city or town for a similar license."  Neither party argues that RSA 322:11 is ambiguous.

Prolerized contends that the transaction fee conflicts with RSA 322:11 and is therefore preempted, arguing that:

[subsection 114.03(E)] of the ordinance requires dealers to pay to the City a fee of [fifty cents] per transaction.  The more transactions a particular dealer processes, the higher its license fee will ultimately be.  As different dealers have different

8

transaction volumes, the ordinance necessarily imposes different fees upon different scrap metal dealers in violation of [RSA 322:11].

The City responds that the ordinance is lawful because all junk and scrap metal dealers are charged the same annual license fee, which is based on square footage, as well as the same fifty-cent fee per transaction. Furthermore, it argues that it is permissible to have transaction fees based on volume, and, therefore, that RSA 322:11 does not preempt the fee. We agree with the City.

By its very terms, RSA 322:11 applies only to license fees paid by junk and scrap metal dealers — not to any other fee paid to the local board. Therefore, the issue before us is whether the fifty-cent transaction fee is a license fee.

The term "license" or "license fee" is not defined in RSA chapter 322. "Therefore, we ascribe to the term its plain and ordinary meaning, utilizing the dictionary definition for guidance." Magoon v. Thoroughgood, 148 N.H. 139, 142 (2002). The term license is commonly understood to mean "a right or permission granted in accordance with law by a competent authority to engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful." Webster's Third New International Dictionary 1304 (unabridged ed. 2002). Indeed, the dictionary definition of license is consistent with the legislature's definition of license in other parts of the Revised Statutes Annotated. See, e.g., RSA 170-E:2, IX (2014) ("'License' means an authorization granted by the commissioner to provide one or more types of child day care."); RSA 170-E:25, XI (2014) ("'License' means a complete license issued to an operator of a child care agency, child care institution or child-placing agency, authorizing the licensee to operate in accordance with the term and conditions of the license, this subdivision, and the rules of the department."); RSA 399-A:1, VI (2006) ("'License' means the authority to do business issued by the commissioner under the provisions of this chapter."); RSA 402-J:2, VI (2006) ("'License' means a document issued by the commissioner authorizing a person to act as an insurance producer for the lines of authority specified in the document."); RSA 433:21, XI (Supp. 2013) ("'License' means an authorization from the director to sell plant stock."); RSA 541-A:1, VIII (2007) ("'License' means the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law.").

Although it is true that the City's description of the fee in its ordinance "does not settle the question of its character," Tirrell v. Johnston, 86 N.H. 530, 535 (1934), we observe that § 114.03(E) refers to the fifty-cent fee as a transaction fee, and that § 110.20 requires payment of a license fee. Section 110.20, entitled "Business License Fees," requires that a person seeking a

license pay a fee "based on the gross square feet of area occupied by the business seeking such license as follows:  For the first 1,500 square feet or fraction thereof, $50; plus $2 per 100 square feet or fraction thereof over 1,500 square feet, except that the maximum fee for any license shall be $1,000." Manchester, Ordinances § 110.20 (2001).  It is of consequence that the fifty-cent transaction fee is not paid in order to secure the right to engage in the business of scrap metal recycling — rather, the fee is paid for each transaction for which a licensed dealer files an electronic record as required by the City regulations.  Manchester, Ordinances § 114.03(E).  The right to engage in such a business is instead secured by the payment required by § 110.20.  See Manchester, Ordinances § 110.20.

We note that Prolerized acknowledges its inability to find cases, and we could not find any, which support its argument that the transaction fee is preempted.  Nonetheless, as Prolerized argues, because the issue is whether the ordinance is preempted by RSA 322:11, the City's arguments as to the validity of volume-based fees under other statutory schemes, see Tirrell, 86 N.H. at 537, or constitutional provisions, see Opinion of the Justices, 94 N.H. 513 (1947), and Northeast Airlines, Inc. v. Aeronautics Comm'n., 111 N.H. 5 (1971), are inapposite.

Because we conclude that the fifty-cent transaction fee is not a license fee, it is not incompatible with state law, and, therefore, is not preempted.

Reversed and remanded.

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.